IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BILLY JAMES DAVIDSON                                                    PLAINTIFF

            v.                          Civil No. 5:18-cv-05239

SHERIFF TIM HELDER, Washington
County, Arkansas; MAJOR DENZER;
and DR. KARAS                                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

In this civil rights action filed pursuant to 42 U.S.C. § 1983, Plaintiff, Billy J. Davidson, contends his constitutional rights were violated while he was incarcerated in the Washington County Detention Center ("WCDC"). Davidson names as Defendants Washington County Sheriff Tim Helder, Major Randall Denzer, and the WCDC physician, Dr. Robert Karas. Davidson contends his constitutional rights were violated when the Defendants exhibited deliberate indifference to his serious medical needs and when Sheriff Helder and Major Denzer acted with deliberate indifference in the handling of his medical grievances.

The case is before the Court on the Defendants' Motion for Summary Judgment. (ECF No. 22-24). Plaintiff has responded (ECF No. 32) to the Motion. The Motion is ready for decision.

## I. BACKGROUND

Davidson was incarcerated at the WCDC from October 6, 2018, until his transfer to the Arkansas Department of Correction ("ADC") on February 26, 2019. (ECF No. 24-2 at 2 & ECF No. 24-4 at 57). During his incarceration, Davidson submitted numerous grievances and medical requests about suffering from anxiety, needing to be seen by a psychiatric nurse, being off his

1

medication, having a bleeding esophageal ulcer, having blood in his stool, his need for an endoscopy, and his need to see an orthopedic physician due to an injury to his hand. *See* (ECF No. 24-4 at 71-154).

Caregiver Johnathan Beckham[1] saw Davidson on October 15th. (ECF No. 24-4 at 63). It was noted that Davidson reported a hiatal hernia and a bleeding ulcer. *Id.* Davidson complained of continuous acid. *Id.* Davidson requested a prescription for Omeprazole.[2] *Id.* Caregiver Beckman noted that he would request review for the possible issuance of a prescription. *Id.* The records indicate Davidson was seen by Nurse Dockery the following day and a prescription for Omeprazole was written.

The medical records indicate Davidson was seen by "psyc" Nurse Sheila Bryant, on October 16th. (ECF No. 24-4 at 64). Davidson reported anxiety, agitation, mood swings, and trouble sleeping. *Id.* He was prescribed Prozac[3] for anxiety. *Id.* at 47. On October 17th, Davidson asked for a medication other than Prozac for anxiety. *Id.* at 71. His request was denied. *Id.* On October 18th, Davidson asked for Buspar,[4] which he indicated his physician had said was closer to Xanax.[5] *Id.* He also asked that his chili serving be substituted with other food because of the onions and chilies. *Id.* His requests were denied. *Id.* He was provided with a

---

[1] In the summary judgment record, there is no indication of whether the caregiver making the note is a nurse, an advanced practice nurse, or some other type of caregiver.

[2] "Omeprazole is used alone or with other medications to treat the symptoms of gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus (the tube between the throat and stomach) in adults and children 1 year of age and older." https://medlineplus.gov/druginfo/meds/a693050.html (accessed Nov. 13, 2019).

[3] Prozac is a brand name for the drug Fluoxetine. "Fluoxetine (Prozac) is used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), some eating disorders, and panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)." https://medlineplus.gov/druginfo/meds/a689006.html (accessed Nov. 22, 2019).

[4] Buspar is short for the drug Buspirone. "Buspirone is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety." https://medlineplus.gov/druginfo/meds/a688005.html (accessed Nov. 18, 2019).

[5] Xanax is the brand name for the drug Alprazolam. "Alprazolam is used to treat anxiety disorders and panic disorder." https://medlineplus.gov/druginfo/meds/a684001.html (accessed Nov. 26, 2019).

second blanket to elevate his head.  *Id.*  He was told he could pick out the onions and chilies unless he had a documented allergy.  *Id.*

Davidson submitted a second request explaining that he could not eat onions and chilies because he had a bleeding ulcer in his esophagus.  (ECF No. 24-4 at 71).  In response, he was told to pick them out.  *Id.*  Davidson stated that Prozac was for depression not anxiety.  *Id.*  In response, Davidson was told that Prozac was for anxiety and panic disorders and that he would not receive Xanax at the WCDC.  *Id.* at 72.  On October 19th, Davidson was told his ulcer was being treated with Omeprazole and that they did not use Buspar for "new treatment of anxiety."  *Id.* at 74.  He was also told he could choose not to eat any foods he desired to and he should provide medical verification of food allergies.  *Id.*

On October 20th, Davidson advised medical that the Prozac was making him feel weird and dizzy.  (ECF No. 24-4 at 74).  He again requested Buspar.  *Id.*

On October 21st, Davidson submitted a grievance stating he needed his antibiotics prescribed "months back" by the Washington Regional Medical Center ("WRMC"); he had a bleeding ulcer in his esophagus and blood in his stool; and he needed an endoscopy.  (ECF No. 24-3 at 5).  According to Davidson, the antibiotics had been stolen before he could take all of them.  (ECF No. 24-4 at 82).  The grievance was transferred to medical.  (ECF No. 24-3 at 5). Davidson's WRMC records were requested.  (ECF No. 24-4 at 74).

The WRMC records show Davidson was admitted on October 26, 2017, and released October 28, 2017.  (ECF No. 24-4 at 29).  An upper endoscopy was done and it "revealed esophagitis and an ulcer around 30 cm along with sloughing distal to this ulcer, nonobstructing Schatzki ring and slight oozing from the ulcer, diffuse gastropathy in the stomach."  *Id.*  His

discharge medications were Augmentin for ten days, Omeprazole, Carafate,[6] and a daily multi-vitamin. *Id.*

On October 22, 2018, Nurse Practitioner Kelley Hinely stated that she had reviewed Davidson's WRMC emergency room records. (ECF No. 24-3 at 5). Nurse Hinely stated that Davidson had only been placed on antibiotics for ten days. *Id.* Nurse Hinely stated that the other medications had been reordered in accordance with the emergency room records. *Id.* Prescriptions were written that day for Omeprazole and Carafate. (ECF No. 24-4 at 75-77).

Davidson was seen on October 22nd by Nurse Andrew Eisele. (ECF No. 24-4 at 78). Davidson appeared anxious and reported increasing depression. *Id.* He again requested Buspar. A review was made of positive coping skills, such as journaling, reading something positive, physical activity during the day, and counting when going to sleep. *Id.* His prescription for Prozac was discontinued. *Id.* at 78.

On October 23rd, Davidson was seen by Dr. Karas. (ECF No. 24-4 at 80). Dr. Karas noted that Davidson had a long history of anxiety. *Id.* Davidson reported having tried Buspar and that it worked. *Id* Dr. Karas approved the use of Buspar and wrote a prescription for fourteen days. *Id.* at 79. Prescriptions were also written for fish oil and magnesium. *Id.* at 80.

Davidson submitted another grievance on October 25th. (ECF No. 24-3 at 6). He asserted that he needed the endoscopy done for his bleeding ulcer and blood in his stool and needed antibiotics. *Id.* Davidson maintained his medical rights were being violated. *Id.* He also

---

[6] Carafate is the brand name for the drug Sucralfate. "Sucralfate is used to treat and prevent the return of duodenal ulcers (ulcers located in first part of the small intestine). Treatment with other medications, such as antibiotics, may also be necessary to treat and prevent the return of ulcers caused by a certain type of bacteria (H. pylori)[.] Sucralfate is in a class of medications called protectants. It sticks to damaged ulcer tissue and protects against acid and enzymes so healing can occur." https://medlineplus.gov/druginfo/meds/a681049.html (accessed Nov. 13, 2019).

asked that he not be given food trays with chili or onions.  *Id.*  The grievance was reassigned to medical services.  *Id.*  On October 26th, Davidson was seen by Nurse Dustin Sanders.  (ECF No. 24-4 at 82).  Davidson's vital signs were stable.  *Id.*  Davidson reported "coffee ground like emesis in the morning with his reflux."  *Id.*  Davidson reported his ulcer was bleeding and again asked for the antibiotics that WRMC had prescribed.  *Id.*  A bland diet was ordered for Davidson.  *Id.* at 82.  Note was made he could not "have spicy or onions" in his diet.  *Id.*  On October 28th, Davidson notified medical that the Carafate was causing stomach cramps and diarrhea.  *Id.* at 83.  The prescription was discontinued the following day.  *Id.* at 84.  On October 29th, Davidson was seen by Nurse Hinely.  *Id.* at 83.  Nurse Hinely ordered a blood check for h. pylori,[7] a stool check for blood, and a complete blood count.  *Id.* at 84.

Davidson submitted a medical request on October 30th.  (ECF No. 24-3 at 20).  Davidson stated he was cramping and fatigued as a result of vitamin deficiency, that his ulcer was bleeding, and he needed one Ensure a day.  *Id.*  Davidson also indicated he doubted medical staff had obtained his antibiotics for his throat yet or an appointment for an endoscopy.  *Id.*  Nurse Dominguez responded that Davidson had been brought to medical and was being taken care of.  *Id.*

On October 31st, Davidson sent a request to Corporal Mulvaney stating that he had gastroesophageal reflux disease ("GERD"), there was blood in his stool, and he needed an endoscopy done because of a life-threatening bleeding esophageal ulcer.  (ECF No. 24-3 at 15).

---

[7] The Helicobacter pylori stool test "looks for foreign proteins (antigens) associated with H. pylori infection in your stool."  https://www.mayoclinic.org/diseases-conditions/h-pylori/diagnosis-treatment/drc-20356177 (accessed Nov. 4, 2019).   "H. pylori infection occurs when a type of bacteria Helicobacter pylori (H. pylori) infects your stomach." https://www.mayoclinic.org/diseases-conditions/h-pylori/symptoms-causes/syc-20356171 (accessed Nov. 4, 2019).

Davidson indicated that the prior year he had been allowed out of jail by Judge Beaumont.  *Id.*
Davidson asked if Corporal Mulvaney would let his public defender know of his concerns.  *Id*.
In response, Corporal Mulvaney said he did not get involved in medical decisions.  *Id.*  Corporal
Mulvaney printed the request and gave it to medical staff.  *Id.*  Davidson also submitted a medical
request asking for an endoscopy to be done.  (ECF No. 24-4 at 87).

On November 1st, Nurse Hinely responded in writing to Davidson's complaint about blood
in his stool by notifying him that his H. pylori test was negative.  (ECF No. 24-3 at 6 & ECF No.
24-4 at 88).  Nurse Hinely stated the WRMC medical records were from October 2017.  *Id.*
Nurse Hinely asked what antibiotic Davidson was supposed to take.  *Id.*  Nurse Hinely also noted
that they found no history of antibiotics when they reconciled his medication.  *Id.*

On November 1st, Davidson submitted a grievance asking to see a throat physician as he
was having trouble swallowing his food.  *Id.* at 7.  The grievance was reassigned to medical
services and Davidson was advised that he was placed on medical call.  *Id.*

On November 1st, a stool test was positive for blood.  (ECF No. 24-4 at 86).  Blood tests
also showed Davidson was anemic.  *Id.* at 89.  He was prescribed iron and Ensure.  *Id.*

On November 1st, Davidson injured his left middle finger on a weld on his bunk.  (ECF
No. 24-7 at 23).  In his deposition, Davidson testified that there was a cyst or knot of some kind
on that finger that had been there for three or four years.  (*Id.* at 24-27).  The cut nicked the knot.
*Id.* at 25.  He was taken to the medical office and examined by Nurse Hinely.  (ECF No. 24-4 at
89).  She noted he had a 1.5 cm cut on his left palmar surface of his left middle finger (existing
contracture noted). She closed the cut with two sutures and applied antibiotic ointment and a
dressing.  *Id.*  Nurse Hinely noted Davidson suffered from chronic gastric ulcer, anemia,

contracture left middle finger, laceration left middle finger, Etoh (alcohol) dependence, and anxiety. *Id.* The plan was to stop Buspar and add Olanzapine,[8] Omeprazole, Amoxicillin,[9] iron, and Ensure. *Id.* at 88-89. The sutures were to be taken out in ten days and the stool sample was to be repeated in two weeks. *Id.*

On November 2nd, Davidson asked Lieutenant Ake if he knew what Davidson's "OR [own recognizance] status" was. (ECF No. 24-3 at 16). Davidson stated that he had blood in his stool, trouble getting food down, and that the "pain is high" in his finger. *Id.* In response, Corporal Mulvaney advised Davidson that the medical department was well aware of his "medical issues and they are dealing with them accordingly." *Id.* With respect to his being released on OR, Davidson was advised that he would need to speak to his attorney about this issue. *Id.*

Davidson submitted a grievance on November 2nd stating that his finger was not sealing up, the nurses said they "don't have time," and he needed to see an orthopedic physician. (ECF No. 24-3 at 8). The grievance was reassigned to medical services. *Id.*

On November 2nd, Davidson asked if the court was aware of his bleeding esophageal ulcer, the cut on his finger that required two stitches and would not hold, and his need for an endoscopy. (ECF No. 24-3 at 23). He stated that it was painful to eat. *Id.* If the court was not aware of his medical condition, Davidson asked that it be told since he did not have an attorney. *Id.* Davidson also asked to see his orthopedic physician, Dr. David Yakin, about his finger, which he stated was very painful. (ECF No. 24-4 at 90). Davidson submitted two other requests on November 2nd

---

[8] "Olanzapine is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions) in adults and teenagers 13 years of age and older. It is also used to treat bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods) in adults and teenagers 13 years of age and older." https://medlineplus.gov/druginfo/meds/a601213.html (accessed Nov. 18, 2019).

[9] The records do not indicate a prescription for Amoxicillin was written. (ECF No. 24-4 at 47-56 & 88-89).

stating he needed to see Dr. Yakin; the cut on his finger was "coming apart" and he could not keep it from bleeding, his pain level was "high;" and asking if an endoscopy had been scheduled. (ECF No. 24-3 at 21-22); (ECF No. 24-4 at 90-91). Davidson reported problems getting his food down. (ECF No. 24-4 at 90).

On November 2nd, a note was made by Dr. Karas, with regard to Davidson's throat complaints, that Davidson was not seen because he was recently seen by provider—in this instance, Nurse Hinely on November 1st. (ECF No. 24-4 at 89-90). A note was made by Nurse Hinely to recheck Davidson's complete blood count in two weeks. *Id.* at 90. With regard to Davidson's complaints about his finger, on November 3rd, Nurse Sanders made a note in the medical records indicating that only one stitch had come out and the wound was bleeding only a small amount. *Id.* at 91. Nurse Hinely was consulted and advised that the one stitch was sufficient so long as the wound had not reopened. *Id.*

On November 5th, Davidson submitted a request again asking if the court was aware of his bleeding ulcer and the cut on his finger. (ECF No. 24-3 at 23). If not, he asked if medical staff could let them know. *Id.* He also stated he needed an endoscopy and that it hurt to "get my food down." *Id.* On November 8th, Nurse Kelley responded: "thanks for the update." *Id.*

On November 6th, Davidson wrote to Corporal Mulvaney asking why he was not on OR. (ECF No. 24-3 at 17). Davidson indicated that "Dr. Kelly" had recommended that he be released on OR because of his bleeding ulcer, his hand needing orthopedic attention, and the blood in his stool. *Id.* Corporal Mulvaney responded that the medical staff had not recommended Davidson's release on OR. *Id.* In any event, even if they had, Corporal Mulvaney pointed out it was not the medical staffs' decision to make. *Id.* Davidson was advised to speak with his

attorney.  *Id.*  Corporal Mulvaney stated he had sent Davidson's requests to the public defenders' office.  *Id.*

Davidson submitted a second request on November 6th asserting that Nurse Kelly had recommended that he be released on his OR and that he thought jail staff could recommend that he be released on his OR.  (ECF No. 24-3 at 18).  Davidson wrote that he was asking for help; he indicated he would sign a waiver; and he asserted that he was unable to contact his attorney. *Id.*  Corporal Mulvaney responded that he had spoken to medical provider Nurse Hinely and she had not recommended that Davidson be "OR'd out."  *Id.*  Corporal Mulvaney stated that the medical staff was well aware of his ulcer issue and his finger/hand injury and Davidson was being treated for both.  *Id.*  Corporal Mulvaney indicated he did not know what "waiver" Davidson was referring to and that Davidson would have to speak with his attorney.  *Id.*

Davidson submitted a request on November 7th stating that medical would not respond to his requests and reporting that his stitches had come out. (ECF No. 24-3 at 1).  The request was reassigned to medical services.  *Id.*; (ECF No. 24-4 at 92).  On November 7th, Corporal Mulvaney noted the following from an e-mail from Nurse Hinely: she did not recommend OR for Davidson for any medical reason; Davidson was being treated for chronic ulcer which was first documented in the emergency room in October of 2017 and reported by him during a prior detention; and Davidson was receiving treatment for the injury to his finger.  (ECF No. 24-3 at 19).

On November 8th, Nurse Hinely added Davidson to the provider call list so that his finger could be assessed. (ECF No. 24-4 at 92).  Davidson's records were requested from Advanced Orthopedics.  *Id.* at 93.  Note was made that after the records were reviewed, they would consider

referral for evaluation of the left contracted digit. *Id.* at 93. Referral to a gastro-intestinal ("GI") physician would also be considered if Davidson's complete blood count was worse, there was evidence of a "GI" bleed, or there was blood in the stool. *Id.* at 94. Davidson was prescribed seven more days of protein shakes and a double blanket. *Id.* at 93-94.

Davidson's records from Advanced Orthopedic Specialists show that Davidson was seen on August 2, 2017, by Dr. Yakin. (ECF No. 24-4 at 1). Davidson had a healing nondisplaced fracture of the middle third of scaphoid bone of his right wrist and an old ulnar styloid fracture. *Id.* at 7. A "[t]humb spica exos brace" was placed to immobilize the hand. *Id.* at 8. Davidson was to be seen again in six weeks. *Id.* He requested narcotic pain medicine but given that his breath smelled of alcohol, Dr. Yakin declined and recommended the use of NSAIDs.[10] *Id*.

Davidson was next seen on September 20, 2017. (ECF No. 24-4 at 14). He reported having pain, stiffness, swelling, weakness and a decreased range of motion on the right side. *Id.* X-rays were taken, and Dr. Yakin noted they showed a "displaced scaphoid fracture, becoming a non union" due to Davidson not wearing the brace properly. *Id.* at 16 & 21. Dr. Yakin concluded surgery was needed to fix the fracture. *Id.* at 17. Dr. Yakin noted the surgery could be done when Davidson was released. *Id.* at 21.

On October 18, 2017, Davidson saw Dr. Yakin for a follow-up visit and complained of his right wrist swelling. (ECF No. 24-4 at 24). Davidson reported that the wrist had been bothering him for months and that it was getting worse with swelling, weakness and pain on the right side. *Id*. X-rays showed: "loose body in right wrist and ulnar styloid nonunion and persistent scaphoid fracture non union." *Id.* at 27. Dr. Yakin ordered a computerized tomography ("CT")

---

[10] NSAIDs are non-steroidal anti-inflammatory drugs such as aspirin and ibuprofen.
https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Treatments/NSAIDs (accessed Nov. 26, 2019).

scan of the right wrist. *Id.* Davidson was diagnosed as suffering from chronic pain syndrome. *Id.* Davidson was going to be referred to another physician for pain management. *Id.* at 28.

The CT scan of Davidson's right wrist was performed on October 30, 2017. (ECF No. 24-4 at 43). The CT scan showed a "mildly displaced scaphoid wrist fracture which demonstrates no evidence of healing," osseous fragments, a mildly displaced ulnar styloid fracture, mild widening of the scapholunate interval suggesting ligament injury, and mild to moderate osteoarthritis. *Id.* No other medical records were submitted concerning the 2017 visits with Dr. Yakin.

On November 8, 2018, Davidson submitted a grievance stating that medical would not respond. (ECF No. 24-3 at 2). He was advised that the grievance would be reviewed and investigated by a sergeant.[11] *Id.* With respect to medical, Davidson was told that "[m]edical will need to clear some of your request[s] before you will be able to communicate with them further." *Id.* Davidson also submitted a medical request asking for his extra blanket. (ECF No. 24-4 at 94). Additionally, he asked the status of his hand appointment with Dr. Yakin and for an endoscopy. *Id.*

Davidson submitted a medical request on November 9th asking if he had an appointment with Dr. Yakin's office. (ECF No. 24-3 at 24); (ECF No. 24-4 at 94). Davidson reported that his hand was swollen in the palm area and the edges of the cut were not staying together. (ECF No. 23-4 at 24). He stated he was in a lot of pain and believed he had nerve damage. *Id.* Davidson also asked that his second blanket be approved again. *Id.* He did not understand why it was taken away. *Id.* Davidson submitted a second medical request the same day asking about

---

[11] There is nothing in the record reflecting an investigation was done.

the status of his appointment with Dr. Yakin and also whether he was going to get an endoscopy done.  *Id.* at 25.  In response, Davidson was placed on review.  *Id.*  Nurse Hinely reviewed his file and decided no change in his care was needed.  (ECF No. 24-4 at 95).

On November 11th, Davidson thanked Lieutenant Foster for speaking with him the day before. (ECF No. 24-3 at 3).  Davidson indicated he would like to be released on his OR due to his medical situation.  *Id.*  He stated he had full coverage insurance to pay for the care he needed.  *Id.*  He pointed out that he had a bleeding ulcer in his esophagus and his hand was healing but something was wrong with his hand and he needed it looked at by an orthopedic physician.  *Id.*  Davidson stated again that the jail was responsible for his hand since the injury was the result of a bad weld on a bunk.  *Id.*  Lieutenant Foster did not respond, at least not via the kiosk.  *Id.*

On November 12th, note was made in the medical records that an appointment should be made "for chronic 3rd middle finger left contracture."  (ECF No. 24-4 at 96).  The appointment was noted to be non-urgent.  *Id.*  Nurse Hinely also noted that Davidson had behavioral problems at a prior appointment with Dr. Yakin and had been terminated as a patient by Ozark Orthopedic.  *Id.*  An appointment was made for Davidson to see Dr. Yakin on November 30th.  *Id.*

On November 14th, Davidson submitted a grievance stating that medical would not tell him if he was being scheduled to be seen by an orthopedic physician.  (ECF No. 24-3 at 10).  The grievance was reassigned to medical services.  *Id.*  Nurse Dominguez answered that for security reasons they could not tell him if an appointment had been made for him.  *Id.*

Davidson submitted a grievance dated November 15th, stating that medical had taken away his prescription for Ensure even though he had been told another prescription would be entered. (ECF No. 24-3 at 11).  Davidson indicated he had lost six pounds in a week.  *Id.*  He also

asserted that nothing was being done about his swollen finger and hands. *Id.* The grievance was reassigned to medical services. *Id.* Davidson wrote that he was appealing this grievance response. *Id.* Corporal Mulvaney responded to the appeal stating he had spoken with Nurse Hinely about this issue several times and that Davidson had an appointment. *Id.* Nurse Hinely informed Corporal Mulvaney that she had explained this to Davidson. *Id.* Davidson was told to have some patience with responses from everyone. *Id.*

Davidson submitted another grievance on November 15th, asking if he could simply be told if he has an appointment with the orthopedic surgeon, Dr. Yakin. (ECF No. 24-3 at 12). He explained he was not asking the date of the appointment but only if an appointment had been made. *Id.* Davidson did not believe the answer would pose a security risk. *Id.* He stated the palm of his hand and his finger were swollen. *Id.* He also wanted to know if an appointment had been made for him to have an endoscopy for his throat ulcer. *Id.* Finally, he complained that Nurse Hinely had taken away the Ensure that he needed. *Id.* The grievance was reassigned to medical services. *Id.*

On November 15th, Nurse Hinely reviewed the results of Davidson's recent blood test and noted it was improving and almost normal making an active GI bleed "highly unlikely." (ECF No. 24-4 at 98). She concluded a GI consult and/or endoscopy was not called for. *Id.* Nurse Hinely responded to Davidson's grievance on November 16th, telling him that his blood count and his nutrition status had improved according to his lab results. (ECF No. 24-3 at 12). Nurse Hinely stated there was no need to continue the nutrition shakes. *Id.* She noted she had continued his shakes at one per day after the date originally prescribed. *Id*.

On November 15th, Davidson also submitted a medical request. (ECF No. 24-3 at 26).

He stated he needed his Ensure. *Id.* In response, Nurse Simmons stated Davidson's body mass

index ("BMI") was within the overweight category and he would not be given any Ensure. *Id.*

Davidson submitted a medical request thanking the medical staff and stating he needed to go to

the hand physician. *Id.* at 27. This was treated as a duplicate request. *Id.* On November 16th,

Nurse Hinely noted that after speaking with Lieutenant Ake she would authorize Davidson to have

Ensure for seven days because Davidson believed the shakes were helping him heal and helped

with his chronic ulcer. (ECF No. 24-4 at 99). Nurse Hinely noted, "I will again remind you that

your blood work showed no evidence of a[n] active bleeding ulcer." *Id.*

On November 16th, Davidson submitted a request to Lieutenant Ake asking if he could

work with the public defenders' office to seek Davidson's release due to his medical condition.

(ECF No. 24-3 at 13). Lieutenant Ake responded that he would call and speak to Davidson's

public defender to "see w[h]ere they are with moving your court date." (*Id*).

On November 18, 2019, Davidson was in an altercation and had a black eye and some

swelling. (ECF No. 24-4 at 99). He denied he was in pain and indicated he did not need

treatment. *Id.* Nurse Dominguez prescribed Naproxen and ice. *Id.*

Nurse Dominguez was called to the pod on November 19th to look at Davidson. (ECF

No. 24-4 at 100). Davidson complained of face pain and indicated he thought his nose was

broken. *Id.* Nurse Dominguez noted that Davidson appeared more concerned with the fact that

he had not eaten and getting his possessions from his previous cell than he was about the injury to

his nose. *Id.* Naproxen and ice were ordered. *Id.* Dr. Karas noted that "[b]roken noses are not

emergent" and that he should be notified if after a week Davidson was having a problem with the

swelling or breathing. *Id.* That same day, the prescription for Naproxen was discontinued.

(ECF No. 24-4 at 101-102). Note was made that he could not have NSAIDS and the prescription was changed to Acetaminophen. *Id.* at 102.

Also, on November 19th, Davidson asked that his meat and beans be pureed because everything else hurt to swallow. (ECF No. 24-4 at 102). In response, note was made that Davidson was on a 3000+ calorie diet and "[i]n the event detainee does not consume items he does not want, he still gets adequate nutrition." *Id.* A stool sample was to be taken to test for occult blood.[12] *Id.*

On November 19th, Davidson indicated that Zyprexa[13] was helping but he thought he needed an increased dose. (ECF No. 24-4 at 101). Nurse Eisele encouraged him to practice positive coping skills and agreed to provide Davidson with a journal. *Id.*

On November 20th, Davidson submitted a grievance and medical request stating that his hand was hurting. (ECF Nos. 24-3 at 14 & 24-4 at 103). He indicated the pain "goes and comes." *Id.* The grievance was assigned to medical services. *Id.* Nurse Dominguez indicated Davidson had been placed "on call" for this issue. *Id.*

Davidson continued to complain at med call that his hand was hurting. (ECF No. 24-4 at 103-104). According to Nurse Hinely, Davidson had been informed that he had an upcoming appointment and had a prescription for Tylenol. *Id.* at 103. Davidson also continued to complain his nose was broken, it bled constantly, and he was having trouble breathing. *Id.* On November

---

[12] "The fecal occult blood test (FOBT) is a lab test used to check stool samples for hidden (occult) blood. . . . Typically, occult blood is passed in such small amounts that it can be detected only through the chemicals used in a fecal occult blood test." The test only establishes the "presence or absence of blood" it does not "determine the source of the bleeding."
https://www.mayoclinic.org/tests-procedures/fecal-occult-blood-test/about/pac-20394112 (accessed December 12, 2019).
[13] Zyprexa is a brand name for the drug Olanzapine. https://medlineplus.gov/druginfo/meds/a601213.html (accessed December 12, 2019).

26th, Davidson advised medical that he could not take Tylenol and that he needed his nose x-rayed. *Id.* at 104. His prescription for Tylenol was stopped and note was made that he should not be given NSAIDS due to his gastric/esophageal ulcer. *Id.*

Davidson was seen by Dr. Karas on November 26th. (ECF No. 24-4 at 105). Davidson complained of having vomited a hand full of dark material. *Id.* Davidson reported this was the third time this had happened since his incarceration. *Id.* Davidson also indicated he would like to have Ensure because of the occasional vomiting. *Id.* Dr. Karas noted that Davidson's blood count had been improving. *Id.* Dr. Karas also ordered another complete blood count in a week. *Id.* No endoscopy was ordered. *Id.* On November 29th, Davidson refused blood draw, saying he did not want further care. *Id.* That same day, he asked for his Zyprexa to be raised. *Id.* Nurse Hinely responded by raising his prescription from one 5 mg tablet a day to one 5 mg tablet twice a day. *Id.* at 106.

Davidson was seen by Dr. Yakin on November 30th for left hand pain. (ECF No. 24-4 at 107). X-rays of the hand came back normal. *Id.* at 110. Dr. Yakin stated it appeared that Davidson had lacerated his tendon and also had contracture of his middle finger. *Id.* In Dr. Yakin's view, hand surgery was required, and Davidson was referred to Dr. Robert Taylor. *Id.* An appointment was made for Davidson to be seen by Dr. Taylor on January 8, 2019.[14] *Id.* at 115.

On December 5th, Nurse Beckman reported that Davidson again refused to let blood be drawn and stated he would refuse further attempts. (ECF No. 24-4 at 115). Davidson submitted a request stating there had been plenty of time to check his blood and he should have been sent to

---

[14] Davidson filed this lawsuit on December 3, 2018. An order directing service on the Defendants was entered the following day. Defendants filed their answer on December 17, 2019.

a specialist by October 30th.  *Id.*  He stated he needed an endoscopy and had contacted an attorney.  *Id.*  Davidson indicated he even had to chew his pills.  *Id.*  Finally, he stated that they should not forget his hand.  *Id.*

An attempt was made again to draw blood on December 6th and Davidson refused.  *Id.* Nurse Hinely responded to Davidson in writing recounting that between the first two draws he had made improvements which suggested that he did not have an active bleed.  *Id.*  She noted he had been given protein shakes to help with healing and that he appeared to be much healthier than when he was arrested.  *Id.*  Nurse Hinely stated Davidson was being treated and he should continue to take his medication as directed.  *Id.*  Nurse Hinely stated she would re-order the blood draw to give him another chance.  *Id.*  She also noted that he had an appointment with Dr. Taylor. *Id.*

On December 7th, Davidson submitted a request stating his hand was swollen again and he needed something for pain.  (ECF No. 24-4 at 116).  He was prescribed Acetaminophen.  *Id.* On December 9th, Davidson indicated that his hand was swollen and he was having sharp pains. *Id.*  He also asked for his Zyprexa to be raised to 7.5 mg.  *Id.*  Nurse Dockery reviewed the notes and determined they should continue with the current plan of care.  *Id.*  She also noted they were in the process of scheduling an appointment with the hand specialist.  *Id.*  Nurse Dockery advised Davidson that his Zyprexa would not be increased because he was currently at the maximum recommended daily dose.  *Id.* at 117.

On December 14th, Davidson wrote that he needed Aleve instead of Tylenol.  (ECF No. 24-4 at 118.  He indicated the Tylenol was upsetting his stomach.  *Id.*  Davidson also stated that the tendon in his hand had been cut, it hurt, and he could not "take much more pain."  *Id.*  Nurse

Hinely responded stated that they would not prescribe Aleve, which was a NSAID, because of his history of gastric ulcers and his ongoing reports of gastric ulcers. *Id.*

On December 31st, Davidson requested that a stool sample be done. (ECF No. 24-4 at 119). He noted his stool was black and looked just like it had looked when he went to WRMC. *Id.* A stool sample and complete blood count were ordered. *Id.* On January 2, 2019, Davidson provided a stool sample and allowed his blood to be taken for testing. *Id.* at 120.

On January 2nd, Davidson asked if he could have Gabapentin[15] for the pain. (ECF No. 24-4 at 119). He also said he needed a "gi done or something." *Id.* He was advised by Nurse Hinely that there was no blood in the stool sample. *Id.* at 120. As for the dark appearance of his stool, Nurse Hinely noted that Davidson had been on iron for the past month and that it could make his stools darker. *Id.* Nurse Hinely stated that she would "present [his] request for gabapentin." *Id.* Nurse Hinely stated she would e-mail him the results of his lab tests and show him the trend between the past three results. *Id.* She noted Davidson could not have anti-inflammatories related to his history of ulcers. *Id.* Nurse Hinely noted that Davidson's weight was 160 which put his BMI at 23 which was normal. *Id.* To qualify for double portions of food, Nurse Hinely stated he would have to have a BMI of 19 or less. *Id.* She put Davidson on multi-vitamins and noted he had an appointment with Dr. Taylor coming up. *Id.*

On January 2nd, Davidson asked to see the "psyc" nurse because he felt his Zyprexa was wearing off and he was having increased anxiety. (ECF No. 24-4 at 120). He also requested

---

[15] "Gabapentin capsules, tablets, and oral solution are used to help control certain types of seizures in people who have epilepsy. Gabapentin capsules, tablets, and oral solution are also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). Gabapentin extended-release tablets (Horizant) are used to treat restless legs syndrome (RLS; a condition that causes discomfort in the legs and a strong urge to move the legs, especially at night and when sitting or lying down)." https://medlineplus.gov/druginfo/meds/a694007.html (accessed Nov. 26, 2019).

Gabapentin for nerve pain. *Id.* Nurse Bryant prescribed him a journal and referred him to the physician. *Id.*

Nurse Dockery reviewed Davidson's requests on January 2nd. (ECF No. 24-4 at 136). She noted his Zyprexa was already at the maximum recommended daily dose. *Id.* She also stated that Gabapentin was not given at the WCDC except for diabetic neuropathy or amputees. *Id.* Nurse Dockery prescribed Acetaminophen for another month. *Id.*

On January 4th, Davidson again requested that his Zyprexa be increased. (ECF No. 24-4 at 138). His request was again refused. *Id.* That same day, note was made that Davidson had consistently been refusing his morning dose of Tylenol and Omeprazole. *Id.* at 138. The morning dose of these medications was discontinued. *Id.*

On January 7th, Davidson was seen by Dr. Karas. (ECF No. 24-4 at 151). Davidson was seen due to complaints of hand pain and losing weight. *Id.* Dr. Karas noted no signs of acute distress and that it had previously been noted that Davidson's left hand had a chronic contracture in the palm and he was unable to extend or flex at the proximal interphalangeal joints ("PIP"). *Id.* Davidson's hand was non-tender on exam. *Id.* Dr. Karas also noted that Davidson's BMI was 23. *Id.*

Davidson was seen by Dr. Taylor on January 8th. (ECF No. 24-4 at 140). Dr. Taylor concluded Davidson had "bowstringing of his tendon to the middle finger and . . . a flexion contracture to the PIP joint of the right middle finger." [16] *Id.* Dr. Taylor stated his recommendation was:

> that if we explore to see if there is anything that can be reconstructed, we can reconstruct it, including work on the PIP joint to see if we can release the contracture as well as repair any of the soft tissue injuries that are present. Even

---

[16] The jail medical records indicate it was Davidson's left middle finger. *See e.g.,* (ECF No. 24-4 at 151).

doing this, I cannot promise him that he will be pain-free, since I am not really sure why he is having so much pain anyway.

The other option I gave him, which I think is a much more viable option and probably the only option I would be willing to do, is that if he is having that much discomfort and he wants a middle finger amputation, I would be happy to do that. A four fingered hand is a very functional hand and, hopefully, would alleviate his symptoms. With his current circumstances of him being in jail and not having access to rigorous postoperative occupational therapy, I think a huge reconstruction of his flexor mechanism is fraught with peril. We will give the jail nurse my recommendations. If they want us to do a third/middle finger amputation, I am happy to. Otherwise, since it is not really an acute injury and there is no way to objectively quantify how much pain he is really having, my recommendation is to not do anything.

*Id.* In a letter dated January 8th, and addressed to "To Whom it May Concern," Dr. Taylor discussed his findings, available options, and his recommendation. (ECF No. 24-4 at 139).

On January 10th, Davidson indicated he would be willing to drop his pending lawsuit if he could get released on OR. (ECF No. 24-4 at 151). Nurse Hinely responded that the ulcer Davidson had in 2017 was not actively bleeding "as of last week." *Id.* Nurse Hinely noted that Davidson's stool did not have blood in it and his blood count was normal. *Id.* She stated that the lawsuit he had pending had "no bearing on [his] medical care." *Id.* Davidson was advised to continue taking his medicine as prescribed and keep the medical staff posted on his needs. *Id.*

A note was made in the medical records that Davidson was continually asking at med call when his next appointment was with the hand specialist. (ECF No. 24-4 at 152). On January 15th, Davidson stated he needed his hand fixed and had insurance that would pay for it. *Id.* He stated he was in pain. *Id.* He indicated that Dr. Taylor said there was possibly an infection in his palm causing the swelling. *Id.* at 152-153. On January 16th, Dr. Karas responded saying there was nothing in Dr. Taylor's records about any infection. *Id.* at 153. Davidson was advised that Dr. Taylor suggested three options of which the best one, in Dr. Taylor's opinion, was to do

nothing.  *Id.* at 153.  Davidson was advised that Dr. Taylor indicated reconstructive surgery might not help as he was not sure of the cause of the pain.  *Id.*  Furthermore, Dr. Taylor stated he would not do reconstructive surgery while Davidson was incarcerated.  *Id.* at 153-154.  Davidson continued to ask for reconstructive surgery because his hand was getting worse and he was in "lots of pain."  *Id.* at 153.

On January 25th, Davidson wrote that he was trying to get an ADC bond so that he would get the surgery done and any help "would be great."  (ECF No. 24-4 at 154).  Nurse Kinely noted that a request would be made for Davidson to be seen by an orthopedic specialist when he was at the ADC.  *Id.*  The request actually sent stated that Davidson had a contracted finger and insisted on being seen again and having surgery.  *Id.* at 158.  On January 31st, the ADC indicated that the decision on whether Davidson needed to see an orthopedic surgeon was deferred and his need for treatment of his hand would be assessed at the ADC.  *Id.*

According to Corporal Mulvaney, detainees of the WCDC may submit medical complaints/requests via an electronic kiosk.  (ECF No. 24-1 at 2).  The requests are reviewed by medical personnel.  *Id.*  Since January 1, 2016, Washington County has contracted with Karas Correctional Health, PLLC ("KCH") to provide medical services at the WCDC.  (ECF No. 24-8 at 1).  Dr. Karas is the jail physician and he or other KCH personnel are the primary medical care providers.  *Id.*

No employee of the WCDC "is authorized to make non-emergency medical decisions on behalf of any inmate."  (ECF No. 24-1 at 2).  In his affidavit, Corporal Mulvaney states the medical providers make "[a]ll decisions regarding medications, medical testing, or medical treatment."  *Id.*

Corporal Mulvaney states that it is the policy of the WCDC "to provide a clean and healthy environment [that] will be maintained through daily hygiene and sanitation practices." (ECF No. 24-1 at 3). This includes providing all inmates with "nourishing food, access to medical and dental care when indicated, clean living quarters, and a healthy, safe, and secure environment." *Id.*

During his deposition, Davidson indicated he first had problems with esophageal ulcers in 2011. (ECF No. 24-7 at 17-19). Davidson testified that while at the WCDC, he wanted antibiotics for this condition and an endoscopy done. *Id.* at 56. Instead, he was prescribed Omeprazole and Carafate. *Id.* at 57. In his opinion, this medication did nothing to cure the ulcer. *Id.* at 57-58.

With respect to his finger injury, Davidson testified that the cell he was in was overcrowded with four men being assigned to a three-man cell. (ECF No. 24-7 at 76 & 81). Because one man was sleeping on the floor, the steps to the top rack were blocked. *Id.* at 82. Davidson felt that if the place had not been so overcrowded, he would not have injured his finger. *Id.* at 76. Further, he noted that if the cell had been properly inspected, the bad weld would have been detected. *Id.* at 76-78. Davidson believes the Sheriff is "responsible for everybody in this jail if something like that happens" as a result of a condition in the jail *Id.* at 78-79.

Davidson recalled seeing Dr. Karas about his anxiety when he wanted a medication other than Prozac. (ECF No. 24-7 at 86). On November 1st he was prescribed Olanzapine. (ECF No. 24-4 at 89. He was also provided with journals. *Id.* 101 & 136. Davidson testified he did not see Dr. Karas over the issues related to his finger or his ulcers and internal bleeding. (ECF No. 24-7 at 64-65 & 86). According to Davidson, Dr. Karas ignored all his requests and grievances

including his requests asking to see a physician. *Id.* at 65. Davidson believed he may have seen Dr. Karas on one other occasion but could not recall what occurred. *Id.* at 86.

When asked about his claim against Sheriff Helder, Davidson testified he assumed Sheriff Helder was aware of his medical needs through the chain of command. (ECF No. 24-7 at 61-62). Although he asked to do so, Davidson never spoke to the Sheriff. *Id.* at 61 & 85. Davidson has no evidence establishing that the Sheriff was aware of Davidson's need for medical care. *Id.* at 61-62. Similarly, with respect to Major Denzer, Davidson never talked to him, but Davidson believes the grievances are put in Major Denzer's box. *Id.* at 63 & 85. Additionally, Davidson testified that he asked to speak to Major Denzer on two occasions. *Id.* at 64.

Davidson maintains that Sheriff Helder and Major Denzer are also liable because there was no effective method of getting any type of investigation into the substance of a medical grievance. He points out that he filed numerous grievances but nothing was ever done. In fact, in reviewing the record, many of Davidson's grievances were automatically reassigned to the medical department. *See e.g.,* (ECF No. 24-3 at 5-12 & 14).

Davidson testified that all three Defendants ignored his medical issues and failed to do their jobs. (ECF No. 24-7. at 74). He also believes he should have been taken to a specialist earlier because his conditions were "out of their means." *Id.* at 88. It is his belief that expensive procedures or referrals to specialists have to be approved up the chain of command. *Id.* at 89.

By affidavit, Dr. Karas indicates that he or other providers employed by KCH, direct and provide all medical treatment and services for inmates in the WCDC. *Id.* KCH has been the contract provider for the WCDC since January of 2016 and provides all medical, dental, and mental health coordination for the inmates. *Id.* All non-emergency medical requests are to be submitted

via the kiosk and medical staff have daily access for purposes of reviewing and responding to the requests.  *Id.* at 1-2.  Dr. Karas states that "[a]ll decisions regarding medications, medical testing, or medical treatment are left to the professional medical judgment of the providers, including myself, at the detention facility."  *Id.* at 2.  Providers do not consult with any WCDC employee "before prescribing any medication, testing, or treatment."  *Id.*  Dr. Karas specially states that he did not consult Sheriff Helder or Major Denzer regarding Davidson.  *Id.*

According to Dr. Karas, Davidson was seen by a mental health professional five times; a health care professional at least ten times; his medical concerns were reviewed fifty-two times; and he was seen four times by a medical provider such as a physician's assistant, nurse practitioner, or a physician.  (ECF No. 24-8 at 3).  Other than the statement that Davidson was seen by a mental health professional five times, Dr. Karas does not separately address in his affidavit Davidson's anxiety treatment.  Dr. Karas does generally assert that no deliberate indifference existed, and that Davidson was treated for his complaints.  *Id.* at 2 & 6-7.

With respect to Davidson's ulcers, Dr. Karas states that "no bloody diarrhea or emesis was obtained."  *Id.*  Although Davidson was found to be mildly anemic on one occasion, Dr. Karas notes his blood count improved and the results of the tests did not indicate an active bleed.  *Id.* at 4.  Dr. Karas also notes that Davidson was weighed on multiple occasions and his BMI never met the criteria for underweight at any time.  *Id.*  Dr. Karas further notes that Davidson was prescribed protein shakes on two occasions.  *Id.*  Dr. Karas indicates that Davidson has a long record of alcohol abuse.  *Id.*  Dr. Karas also indicates that Davidson was prescribed Omeprazole to treat his ulcer, from October 8, 2018, until he left the custody of the WCDC.  *Id.*

With respect to Davidson's cut finger, Dr. Karas notes he was examined and given proper

wound care. (ECF No. 24-8 at 5). According to Dr. Karas, there was no visualization of tendon, nerve or bone involvement. *Id.* With respect to the finger contracture on Davidson's left hand, Dr. Karas points out it was noted to exist in Davidson's Ozark Orthopedics' medical records as early as May 15, 2017. *Id.* at 5. The records indicate it was a Dupuytren's contracture.[17] *Id.* Dr. Karas asserts that the finger contracture was not caused by, or related to, the cut Davidson reported on November 1, 2018. *Id.* at 7. Dr. Karas notes that appointments were made for Davidson to see two specialists regarding his hand, Dr. Yakin and Dr. Taylor. *Id.* at 5-6. With respect to Davidson's request for surgery, Dr. Karas points out that Dr. Taylor would not perform reconstructive surgery and recommended leaving the hand as is. *Id.* at 6. Dr. Karas maintains the treatment provided to Davidson was medically appropriate and addressed the complaints he raised. *Id.*

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a

---

[17] "Dupuytren's (du-pwe-TRANZ) contracture is a hand deformity that usually develops over years. The condition affects a layer of tissue that lies under the skin of your palm. Knots of tissue form under the skin — eventually creating a thick cord that can pull one or more fingers into a bent position. The affected fingers can't be straightened completely, which can complicate everyday activities such as placing your hands in your pockets, putting on gloves or shaking hands." https://www.mayoclinic.org/diseases-conditions/dupuytrens-contracture/symptoms-causes/syc-20371943 (accessed Nov. 13, 2019).

genuine issue of material fact exists." *National Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III.   DISCUSSION

Defendants maintain they are entitled to summary judgment for the following reasons: (1) there is no proof of any personal involvement by Sheriff Helder or Major Denzer; (2) Dr. Karas was not deliberately indifferent to Plaintiff's serious medical needs; (3) Defendants are entitled to qualified immunity; and (4) there is no basis for official capacity/county liability.

As noted above, Davidson asserts two separate categories of deliberate indifference claims. His first claim is that Defendants exhibited deliberate indifference in denying him adequate medical care. His second claim is that Sheriff Helder and Major Denzer exhibited deliberate indifference in establishing and overseeing the procedure for handling medical grievances. The Court must examine each category of claims separately in deciding whether Defendants are entitled to summary judgment.

### A.   Personal Capacity Claims against Sheriff Helder and Major Denzer for Denial of Medical Care

Sheriff Helder and Major Denzer argue that Davidson's claims against them are based on mere assumptions. According to Defendants, Davidson's first erroneous assumption is that

Sheriff Helder and Major Denzer are liable anytime an inmate is injured as a result of a condition existing in the jail, *i.e.,* the sharp weld that Davidson cut his hand on. Second, Defendants maintain Davidson erroneously assumes that Sheriff Helder and Major Denzer are liable for the inadequate medical care he received because of the chain of command.

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of right. To establish personal liability of a supervisory defendant, [plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (internal quotations and citation omitted). A "general responsibility for supervising the operations of a prison is insufficient to establish personal involvement required to support liability." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995); *see also Reynolds v. Dormire*, 636 F.3d 976, 981 (8th Cir. 2011). Moreover, a supervisor, who lacks medical expertise, cannot be liable for "medical staff's diagnostic decision[s]." *Id.* However, "a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).

In this case, there is no evidence that Sheriff Helder or Major Denzer were involved in any way in deciding what treatment Davidson should receive. Davidson admits he never communicated directly with either Sheriff Helder or Major Denzer. As there is no evidence Sheriff Helder or Major Denzer even knew about Davidson's serious medical needs, they could not have acted with deliberate indifference to those needs. Sheriff Helder and Major Denzer are

entitled to judgment on the personal capacity denial of medical care claims. *See e.g., Langford v. Norris*, 614 F.3d 445, 460-61 (8th Cir. 2010).

### B.  Personal Capacity Claim against Dr. Karas for the Denial of Medical Care

Dr. Karas maintains that Davidson received appropriate medical care for his serious medical needs.  Dr. Karas points out that Davidson was seen multiple times; his records were reviewed multiple times; his conditions were treated; and he was referred to two different specialists.

"[D]eliberate indifference to serious medical needs constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[18]  "To prove his deliberate indifference claim, [Davidson] must show:  (1) he suffered from an objectively serious medical need, and (2) [Dr. Karas] knew of the need yet deliberately disregarded it." *Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019)(internal quotation marks and citation omitted).

"A medical need is objectively serious if it has been diagnosed by a physician as requiring treatment or if it is so obvious that even a layperson would easily recognize the necessity for a physician's attention." *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018)(internal quotation marks and citations omitted).   In this case, the Court will assume for purposes of this motion that Davidson had several serious medical conditions.   This assumption is easily made, as Davidson was being treated for ulcers, anxiety, and for a laceration to his hand.

---

[18] Davidson's status changed from that of a pretrial detainee to a convicted prisoner on January 28, 2019.   (ECF No. 24-2 at 1).   For purposes of this motion, the change in status does not alter the analysis.   The Court of Appeals for the Eighth Circuit applies the Eighth Amendment standard to both categories of inmates. *See e.g., Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019)(recognizing that the Fourteenth Amendment applies to pretrial detainees but applying the Eighth Amendment standard because pretrial detainees are entitled to at least as much protection as convicted prisoners)(citation omitted).

The Court notes that Defendants argue there is no proof Davidson had an ulcer while incarcerated at the WCDC. Defendants, however, seem to ignore the fact that Davidson was prescribed medication to treat ulcers, Omeprazole and Carafate, had blood present in his stool on one occasion, was anemic for a period of time, was provided accommodation in his diet, and complained of dark/black emesis, which are all symptoms of ulcers and/or bleeding ulcers. Additionally, Davidson had been hospitalized for several days within the last twelve months as a result of bleeding ulcers.

"[T]o demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness; disregarding a known risk to the inmate's health." *Thompson v. King,* 730 F.3d 742, 746-47 (8th Cir. 2013)(internal quotation marks and citation omitted). This standard has been referred to as an onerous one that "requires a showing more than negligence, more even than gross negligence, but less than purposely causing or knowingly bringing about a substantial risk of serious harm to the inmate." *Id.* at 747.

It is settled law that a mere disagreement with a treatment plan does not constitute deliberate indifference. *Meuir v. Green Cty. Jail Emps.*, 487 F.3d 1115, 1118-19 (8th Cir. 2007). Prison physicians are free to exercise their independent medical judgment and inmates have no constitutional right to a particular course of treatment. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

With respect to the treatment of his ulcer, it is true that Davidson was not taken to a specialist for an endoscopy to be performed. However, he was given ulcer medication; his blood count was monitored; he was prescribed iron; his stool was checked for blood; and he was provided

accommodations in his diet—given Ensure on two separate occasions for several days and put on a bland diet. Davidson's blood tests showed an improvement over time and follow-up stool samples showed no presence of blood indicating no active GI bleeding. Davidson clearly disagrees with the adequacy and effectiveness of the medical treatment he received. However, mere disagreement with treatment decisions fails to state a claim of deliberate indifference.

With respect to the treatment of his hand, the injury occurred on November 1st but was complicated by the existing contracture; Davidson's injury was cleaned, stitched, and had antibiotic ointment applied; and Davidson was seen by his orthopedic physician, Dr. Yakin, on November 30th, and referred to Dr. Taylor. Davidson was seen by Dr. Taylor on January 8, 2019, and Dr. Taylor listed available options but indicated the best option given Davidson's incarceration was to do nothing with the hand deformity at that point. Considering the contracture had existed since 2017, Dr. Taylor was unsure of the cause of the pain. Further, even if reconstructive surgery was performed, Dr. Taylor indicated there was no guarantee that Davidson's pain would be reduced. Dr. Karas, in the exercise of his medical judgment, decided to accept the recommendation of the specialist to do nothing. Davidson has no constitutional right to a particular course of treatment including surgery. *See e.g., Blondheim v. County of Olmsted*, 47 Fed. App's 766 (8th Cir. 2002)(physicians at correctional facility were not deliberately indifferent by treating inmate's torn ACL conservatively over four years, mainly with Tylenol and ace bandages, even though they knew outside orthopedic surgeon had recommended surgery); *Smith v. Iverson*, No. 8:19-cv-298, 2019 WL 4417548, *10 (D. Neb. Sept. 16, 2019)("A jail doctor does not act with deliberate indifference, when in the exercise of his professional judgment, he concludes the inmate will not be placed at risk by foregoing a particular course of treatment,

including surgery"); *Moore v. Schuetzle*, 354 F. Supp. 2d 1065 (D.N.D. 2005)(no deliberate indifference where medical staff determined that additional surgery to improve the functioning of inmate's finger was not medically necessary). There are no genuine issues of fact as to whether Dr. Karas exhibited deliberate indifference in his treatment of Davidson's finger injury.

With respect to his anxiety, although Davidson did not agree with the drug prescribed to treat the condition and wanted something different, the decision of what drug to prescribe is a decision within the medical judgment of the physician. *See e.g., Satchell v. Petray*, No. 06-5231, 2008 WL 4277989, *11(W.D. Ark. Sept. 18, 2008)("The type of medication to prescribe, the tests to be ordered, and the appropriate treatment for a given medical condition all involve the exercise of medical judgment"). Davidson was prescribed the anxiety medication Prozac just ten days after he was booked in. (ECF No. 24-4 at 47). When Davidson reported bad side effects from Prozac, it was discontinued and he was prescribed Buspar, the drug he had been requesting and indicated had worked for him in the past. *Id.* at 79-80. His medication was changed again to Olanzapine and when he complained that the drug was not lasting the whole day, the dosage was increased and he was given it twice per day. *Id.* at 88-89 & 106. Although he requested a further increase, this request was denied as he was at the maximum recommended dosage. *Id.* at 136. Davidson was also educated on other coping skills including journaling. *Id.* at 78. There is no evidence of deliberate indifference on Dr. Karas' part. Dr. Karas is entitled to judgment in his favor on the denial of medical care claim.

**C. Personal Capacity Claim Against Sheriff Helder and Major Denzer for Deliberate Indifference in Connection with the Grievance System**

Davidson points out that Sheriff Helder and Major Denzer are responsible for adopting, implementing, and overseeing the grievance procedure as it applies to medical issues. Davidson points out that the WCDC policy on medical, dental, and psychiatric care requires the Chief Executive, presumably Sheriff Helder, to ensure that a procedure exists for providing necessary care to all inmates. (ECF No. 24-6 at 1). With respect to Major Denzer, Davidson notes that the grievance procedure requires the jail administrator, or his designee, to be notified when a grievance alleges a violation of his civil rights. *Id.* at 28. Davidson aptly notes that many of his grievances were simply reassigned to medical staff so there was no effective review of his allegations that the medical staff violated his federal constitutional rights.

The Court agrees that there was no investigation of many of Davidson's grievances asserting medical staff were denying him medical treatment. Even when an "investigation" occurred, it appears to have consisted solely of asking the medical staff whether Davidson was being provided care. The Court also agrees that this is a viable theory of liability. There are really two categories of deliberate indifference when a plaintiff contends he was denied medical care **and** that his medical grievances were ignored. *See Langford*, 614 F.3d at 464. It has long been the law that "the mere contracting of services with an independent contractor does not immunize [a governmental official] from liability for damages in failing to provide a prisoner with the opportunity for such treatment." *Langford*, 614 F.3d at 460. "In this sense the defendants have a nondelegable duty to provide medical care when needed." *Crooks v. Nix*, 872 F.2d at 800, 804 (8th Cir. 1989).

Davidson's claim nevertheless fails because the policies did not, under the circumstances of this case and as discussed above, deny him constitutionally adequate medical care. Sheriff Helder and Major Denzer are entitled to summary judgment on this claim.

### D. Qualified Immunity on the Personal Capacity Claims

Defendants contend that they are entitled to qualified immunity on Davidson's claims against them in their individual capacities. The Court agrees. "Qualified immunity shields a government official from liability when his conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009)(*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity inquiry consists of two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the Plaintiff, establish a violation of a constitutional right; and (2) whether that constitutional right was clearly established as of the time of the relevant conduct such that a reasonable official would have known that his actions were unlawful. *Id.* "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Id.* Having found that the facts as alleged by Davidson do not make out a constitutional violation, Defendants are entitled to qualified immunity.

### E. Existence of an Official Capacity Claim

Davidson has asserted an official capacity claim. Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010). To hold a governmental entity liable, a plaintiff must establish that a municipal policy or custom caused the deprivation of his constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989). This requires a

plaintiff to prove the custom or policy was the moving force behind the constitutional violation.

*Monell v. Department of Soc. Servs.,* 436 U.S. 658, 694 (1978).

Here, Davidson contends the Defendants failed to follow policy. He does not argue there was anything unconstitutional about the policy itself or that it was the moving force behind the alleged constitutional violations. Defendants are entitled to summary judgment on the official capacity claim.

## IV.   CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (ECF No. 22) is **GRANTED and this case is DISMISSED WITH PREJUDICE.**

IT IS SO ORDERED this 19th day of December 2019.

*/s/ P. K. Holmes, III*
P. K. HOLMES, III
U.S. DISTRICT JUDGE